UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| OMAN ALUMINIUM ROLLING COMPANY LLC | : <br> : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | :      Court No. 21-00266 <br> : |
| UNITED STATES, | : <br> : |
| Defendant. | : <br> : |

**COMPLAINT**

Plaintiff Oman Aluminium Rolling Company LLC ("Plaintiff" or "OARC"), by and through its attorneys, alleges and states as follows:

1. Plaintiff seeks judicial review of the final determination of the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation of common alloy aluminum sheet ("CAAS") from the Sultanate of Oman, covering the period January 1, 2019 through December 31, 2019. *Common Alloy Aluminum Sheet from the Sultanate of Oman: Final Affirmative Determination of Sales at Less Than Fair Value and Negative Determination of Critical Circumstances*, 86 Fed. Reg. 13,328 (Dep't Commerce Mar. 8, 2021) ("*Final Determination*"), and accompanying Issues & Decision Memorandum ("IDM"). After the U.S. International Trade Commission ("ITC") made an affirmative final injury determination in the investigation, Commerce published notice of the antidumping duty order on CAAS from Oman on April 27, 2021. *Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 22,139 (Dep't of Commerce Apr. 27, 2021) ("*AD Orders*").

## JURISDICTION

2. Plaintiff brings this action pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i) to review a final affirmative determination made by Commerce under 19 U.S.C. § 1673d. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).

## STANDING

3. Plaintiff is a producer and exporter of CAAS from Oman and, thus, meets the definition of an "interested party" within 19 U.S.C. § 1677(9)(A).

4. Plaintiff participated in the underlying investigation giving rise to this action and, therefore, constitutes "a party to the proceeding in connection with which the matter arose" under 19 U.S.C. § 1516a(a)(2)(A).

5. As an interested party who participated as a party in the underlying proceeding, Plaintiff has standing to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS OF THE ACTION

6. Commerce published notice of its affirmative final determination in the *Federal Register* on March 8, 2021. After the ITC made an affirmative final injury determination in the investigation, Commerce subsequently published notice of the antidumping duty order on CAAS from Oman on April 27, 2021. Therefore, Plaintiff commenced this action within the time period specified in 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and 28 U.S.C. § 2636(c).

7. Plaintiff filed its Summons for this action on May 27, 2021.

8. Plaintiff timely filed this Complaint within 30 days of the filing of the Summons in this action, as required by the time limits set forth in 19 U.S.C. § 1516a(a)(2)(A) and Court Rule 3(a)(2).

## PROCEDURAL HISTORY

9. On March 9, 2020, the Aluminum Association Common Alloy Aluminum Sheet Enforcement Working Group and its individual members, Aleris Rolled Products, Inc., Arconic Inc., Constellium Rolled Products Ravenswood, LLC, JW Aluminum Company, Novelis Corporation, and Texarkana Aluminum ("Petitioners"), filed a petition with Commerce and the ITC alleging that imports of CAAS from Oman were sold in the United States at less than fair value and that those imports injure the domestic CAAS industry.

10. On March 30, 2020, Commerce initiated an antidumping duty investigation on imports of CAAS from Oman. *See Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Republic of Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and the Republic of Turkey: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 19,444 (Dep't of Commerce Apr. 7, 2020).

11. On October 9, 2020, Commerce preliminarily determined that CAAS from Oman "is being, or is likely to be, sold in the United States at less than fair value." *Common Alloy Aluminum Sheet from the Sultanate of Oman: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Negative Determination of Critical Circumstances, and Postponement of Final Determination*, 85 Fed. Reg. 65,340, 65,340 (Dep't of Commerce Oct. 15, 2020) ("*Preliminary Determination*"), and the accompanying Preliminary Decision Memorandum ("PDM"). In so doing, Commerce found that OARC is affiliated with Sohar Aluminium LLC ("Sohar Aluminium"), Sohar Paper Core LLC, and Oman Oil Marketing Company, pursuant to 19

U.S.C. § 1677(33)(F).  *See* PDM at 5-6; *see also* Memorandum from Chelsey Simonovich, Senior International Trade Analyst, to Dana S. Mermelstein, Director, *Re: OARC Preliminary Affiliation Memorandum* (Oct. 6, 2020) ("OARC Prelim. Affiliation Memo").  Commerce preliminarily concluded that OARC and Sohar Aluminium are affiliated on the basis of common control by Oman Oil Company.  *See* PDM at 5-6, OARC Prelim. Affiliation Memo at 3.

12. In the *Preliminary Determination*, Commerce determined OARC's cost of production using information submitted by OARC with one exception:  in applying the major input rule, Commerce relied on adverse facts available ("AFA") to calculate the cost of production of liquid aluminum, a major input in the production of subject merchandise, which OARC's alleged affiliate Sohar Aluminium supplied to OARC during the period of investigation.  *See* PDM at 7–8; *see also* Memorandum from Yan Zhang, Staff Accountant, to Neal M. Halper, Director, Office of Accounting, *Re: Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Oman Aluminium Rolling Company LLC (OARC)* (Oct. 6, 2020) ("Prelim. Cost Memo").

13. Specifically, Commerce preliminarily found that all information necessary to conduct the cost of production calculation with regard to Sohar Aluminium's purchases of upstream inputs from its alleged affiliates was not available based on the record of the investigation, which precluded Commerce from performing an accurate major input analysis and required Commerce to rely on facts otherwise available.  *See* PDM at 6–7; Prelim. Cost Memo at 2.  Commerce further found that OARC withheld requested information regarding Sohar Aluminium's transactions with Sohar Aluminium's purportedly affiliated suppliers of upstream inputs, such that OARC did not act to the best of its ability to comply with requests for information by Commerce.  PDM at 7.  As a result, Commerce preliminarily determined to calculate Sohar

Aluminium's cost of production by applying AFA to determine the market prices related to Sohar Aluminium's purchases of upstream inputs from allegedly affiliated suppliers. PDM at 7–8; Prelim. Cost Memo at 2, Attachment 1. However, Commerce at no point specifically determined that Sohar Aluminium was affiliated with these upstream input suppliers. *See generally* PDM; OARC Prelim. Affiliation Memo. Based on these findings, Commerce calculated a preliminary dumping margin for OARC of 3.53 percent. *See Preliminary Determination*, 85 Fed. Reg. at 65,341.

14. On March 8, 2021, Commerce published its final determination in the investigation, continuing to find that OARC sold CAAS to the United States at less than fair value. *Final Determination*, 86 Fed. Reg. at 13,328. In so doing, Commerce again found that OARC was affiliated with Sohar Aluminium pursuant to 19 U.S.C. § 1677(33), finding that OARC and Sohar Aluminium are under the common control of Oman Oil Company. *See* IDM at 28; Memorandum from Chelsey Simonovich, Senior International Trade Analyst, AD/CVD Operations, Office VI, to Dana S. Mermelstein, Director, AD/CVD Operations, Office VI, *Re: OARC Affiliation Memo* (Mar. 1, 2021) at 4–5 ("OARC Final Affiliation Memo"). Commerce rejected OARC's argument that Oman Oil Company did not control Sohar Aluminium because it only owns a 40 percent ownership stake in Sohar Aluminium, concluding that the Oman Oil Company, through its minority ownership in Sohar Aluminium, is capable of exercising restraint over Sohar Aluminium's operations. *See* OARC Final Affiliation Memo at 5.

15. In its *Final Determination*, Commerce again applied the major input rule to liquid aluminum sourced by OARC from Sohar Aluminium, adjusting the alleged transfer price to the higher of the market price or the cost of production. *See* IDM at 18. In doing so, Commerce applied the transactions disregarded rule to transactions between Sohar Aluminium and its

purported upstream affiliated suppliers, adjusting the transfer price of the upstream inputs or services accordingly. *See id.* Commerce continued to find that certain information related to OARC's transactions with Sohar Aluminium was missing from the record, asserting that OARC did not disclose Sohar Aluminium's purchases of upstream inputs from its allegedly affiliated suppliers. *See* IDM at 14–15. Consequently, Commerce again applied AFA in calculating Sohar Aluminium's reported material costs and total conversion costs. *See* IDM at 14. Commerce rejected OARC's argument that Commerce should limit its AFA adjustment to Sohar Aluminium's purchases of upstream inputs from purportedly affiliated suppliers, rather than the remaining conversion costs unrelated to those purchases. *See* IDM at 16. And Commerce once again failed to explicitly determine that Sohar Aluminium was affiliated with any of the upstream input suppliers at issue. *See generally* IDM; OARC Final Affiliation Memo.

16. As a result of its findings, Commerce assigned OARC a weighted average dumping margin of 5.29 percent. *See Final Determination*, 86 Fed. Reg. at 13,329.

17. On April 27, 2021, following the ITC's issuance of its final affirmative injury determination, Commerce published notice of the antidumping duty order on CAAS from Oman. *See AD Orders*, 86 Fed. Reg. 22,139.

## STATEMENT OF CLAIMS

18. Paragraphs 1 through 17 are incorporated by reference.

19. In the following respects and for other reasons apparent from the record of the administrative proceeding, Commerce's *Final Determination* is not supported by substantial evidence and otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

## COUNT ONE

20. Paragraphs 1 through 19 are incorporated by reference.

21.     In the *Final Determination*, Commerce erroneously treated OARC and Sohar Aluminium as affiliates based on common control pursuant to 19 U.S.C. § 1677(33)(F). Under 19 U.S.C. § 1677(33)(F), affiliation based on common control requires "two or more persons directly or indirectly controlling, controlled by, or under common control with, any person." Section 1677(33)(F) further provides that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."

22.     Commerce misapplied this affiliation standard when it found that OARC and Sohar Aluminium are under the common control of Oman Oil Company. Evidence of the record did not show that Oman Oil Company is in a position to exercise control over *both* Sohar Aluminium and OARC. While Oman Oil Company does exercise control over OARC through its 100 percent indirect ownership stake in OARC, its 40 percent ownership stake in Sohar Aluminium does not place Oman Oil Company in a position to legally or operationally exercise control or restraint over the company. Oman Oil Company and Abu Dhabi National Energy Company ("ADNEC") have equal ownership (i.e., 40 percent) in Sohar Aluminium, and Rio Tinto Alcan also has a 20 percent ownership stake. This ownership structure is reflected in the composition of Sohar Aluminium's five-member board, which is proportionally divided among the three shareholders: two from Oman Oil Company, two from ADNEC, and one from Rio Tinto Alcan. Accordingly, Oman Oil Company is not in a position to exercise restraint or control over the production and sales of Sohar Aluminium, as it does not have a controlling stake in Sohar Aluminium.

23.     Therefore, Commerce's finding that OARC and Sohar Aluminium are affiliated by virtue of common control by Oman Oil Company is not supported by substantial evidence on the record and is not otherwise in accordance with law.

## COUNT TWO

24. Paragraphs 1 through 23 are incorporated by reference.

25. Even if Commerce properly determined that OARC is affiliated with Sohar Aluminium, Commerce nevertheless acted contrary to law in its application of the major input rule with regard to its determination of Sohar Aluminium's cost of production. 19 U.S.C. § 1677b(f)(3) allows Commerce to, in cases of transactions between affiliated persons involving a major input to the subject merchandise, "determine the value of the major input on the basis of the information available regarding such cost of production." In the underlying investigation, Commerce examined Sohar Aluminium's data on the production of liquid aluminum, a major input in the production of subject merchandise, based on the erroneous conclusion that OARC and Sohar Aluminium are affiliated. If the Court determines that Commerce should not treat OARC and Sohar Aluminium as affiliates, then it should instruct Commerce to reconsider OARC's cost of production without taking into account Sohar Aluminium's cost of production information related to liquid aluminum.

26. However, if the Court determines that Commerce properly treated OARC and Sohar Aluminium as affiliates, the Court should nevertheless conclude that Commerce unlawfully went beyond Sohar Aluminium's data in determining the cost of production for liquid aluminum. Rather than relying solely on Sohar Aluminium's cost of production information for liquid aluminum, Commerce instead examined Sohar Aluminium's purchases of upstream inputs from Sohar Aluminium's purportedly affiliated suppliers pursuant to the transactions disregarded rule under 19 U.S.C. § 1677b(f)(2). The major input rule only applies to a respondent's own purchases of a major input and the costs of production associated with such purchases of the major input. Thus, although Commerce properly examined Sohar Aluminium's actual cost of production with respect

liquid aluminum if it was lawful for Commerce to treat OARC and Sohar Aluminium as affiliates, Commerce had no authority to adjust the cost of production based on Sohar Aluminium's purchases of upstream inputs from purportedly affiliated suppliers. Sohar Aluminium's transactions with its purportedly affiliated suppliers are not relevant to Commerce's major input analysis because these transactions do not relate to *OARC's* purchases of its major input, which is the relevant transaction for purposes of application of the major input rule.

27. Moreover, Commerce did not sufficiently explain its methodology under the major input and transactions disregarded rule, nor did Commerce explain why it went beyond the information on the record to conduct its major input analysis. Evidence on the record indicates that Commerce had the information available to determine the value of liquid aluminum using the major input rule, because it had on the record (1) the price paid by OARC to Sohar Aluminium for the liquid aluminum, (2) the market price of the major input in Oman, and (3) Sohar Aluminium's costs associated with producing the major input. Commerce never specified why it needed to go beyond the information on the record and examine Sohar Aluminium's purchases of upstream inputs from purportedly affiliated suppliers. The methodology pursuant to which it adjusted Sohar Aluminium's cost of production in the *Final Determination* was thus not reasonably discernible.

28. Finally, Commerce's final determination is unlawful for the separate reason that Commerce never made a determination that Sohar Aluminum was affiliated with any of the upstream input suppliers at issue. Instead, Commerce assumed without explanation or a specific finding that such affiliation exists. Commerce's unexplained and unsupported determination is arbitrary and capricious and therefore unlawful.

29. Accordingly, Commerce's application of the major input rule, in which it adjusted Sohar Aluminium's cost of production based on Sohar Aluminium's purchases of upstream inputs

from purportedly affiliated suppliers, was not supported by substantial evidence on the record and was otherwise not in accordance with law.

## COUNT THREE

30. Paragraphs 1 through 29 are incorporated by reference.

31. Even if (1) Commerce properly treated OARC and Sohar Aluminium as affiliates, (2) Commerce properly examined Sohar Aluminium's purchases of upstream inputs as part of its major input analysis, and (3) Commerce properly treated Sohar Aluminum and its upstream input suppliers as affiliates, Commerce nevertheless improperly applied AFA in calculating the cost of production because the circumstances did not meet the legal requirements under 19 U.S.C. § 1677e(b). Commerce asserted that it properly applied AFA because it could not conduct a reliable major input analysis for liquid aluminum supplied by Sohar Aluminium to OARC based on the information available on the record. Commerce argued that OARC failed to disclose *Sohar Aluminium's* transactions with Sohar Aluminium's purported affiliated suppliers in OARC's responses to Commerce's requests for Sohar Aluminium's cost of production information. It thus applied AFA with respect to Sohar Aluminium's cost of producing liquid aluminum by adjusting Sohar Aluminium's total conversion costs through application of the transactions disregarded rule. However, the statute only permits Commerce to apply AFA when Commerce determines that an interested party has not acted to the best of its ability to comply with Commerce's information requests. *See* 19 U.S.C. § 1677e(b). Moreover, the statute required Commerce to afford parties an opportunity to remedy deficiencies in its reported information, and only if the party fails to remedy the deficiency within the applicable time may Commerce disregard all or part of a party's responses. *See* 19 U.S.C. § 1677m(d) and (e).

32. First, OARC and Sohar Aluminium cooperated to the best of their abilities. OARC fully complied with Commerce's requests for information, and its responses did not meet the statutory threshold for applying AFA. OARC and Sohar Aluminium responded to all of the questions from Commerce over the course of multiple questionnaires. To the extent that Commerce did not have the necessary information to complete its analysis, it was statutorily required to ask OARC or Sohar Aluminium for this information, but it never did so. However, Commerce did not clearly identify any information missing from the record. Sohar Aluminium—which was not a party to the investigation—permitted OARC to submit its audited financial statements to Commerce in its *first* response to Commerce's requests for information, and those financial statements clearly included Sohar Aluminium's transactions with purportedly affiliated suppliers of upstream inputs. OARC thus disclosed Sohar Aluminuim's minor transactions with Sohar Aluminium's allegedly affiliated suppliers. Commerce's AFA determination claimed that OARC did not identify Sohar Aluminium's affiliates in its Section A questionnaire response. However, even if OARC's initial Section A questionnaire response was deficient, OARC cured those deficiencies in supplemental questionnaire responses, rendering the application of AFA unwarranted. Because Commerce did not clearly identify which information was purportedly missing from the record, and because it did not provide OARC with an opportunity to remedy any deficiencies in its responses, it had no justification for applying AFA under the statute.

33. Second, OARC does not control Sohar Aluminium. Accordingly, even if OARC could not supply perfect information from Sohar Aluminium, Commerce cannot legitimately penalize OARC under the statute for OARC failing to provide information that it could not compel Sohar Aluminium to provide.

34. Third, even if Commerce properly applied AFA, it acted contrary to law when it relied on AFA for all of Sohar Aluminium's input purchases, regardless of whether Sohar Aluminium was affiliated with the supplier. Commerce may only apply AFA to fill gaps in information that is missing from the record, and the only missing information that Commerce identified was related to Sohar Aluminium's purchases of upstream inputs from allegedly *affiliated* suppliers. Accordingly, to the extent AFA may have been warranted, the statute only allowed Commerce to rely on AFA in the place of information absent from the record, i.e., Sohar Aluminium's purchases of upstream inputs from purportedly affiliated suppliers.

35. Therefore, for the reasons provided in paragraphs 30 through 34, Commerce's application of AFA to OARC was unsupported by substantial evidence and otherwise not in accordance with law.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court (1) hold that Commerce's final determination in the subject investigation is unsupported by substantial evidence on the record and otherwise not in accordance with law; (2) remand the investigation to Commerce for disposition consistent with any orders and opinions of this Court; and (3) provide such other relief as this Court deems just and proper.

Respectfully submitted,

Bernd G. Janzen
Yujin K. McNamara
Devin S. Sikes
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
*Counsel to Plaintiff Oman Aluminium Rolling Co., LLC*

Dated: June 25, 2021

**CERTIFICATE OF SERVICE**

       I, Bernd G. Janzen, hereby certify that on June 25, 2021, copies of the foregoing Complaint were served on the following parties by certified mail, return receipt requested:

Kyle S. Beckrich
U.S. Department of Justice
Commercial Litigation Branch—Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

Leslie Mae Lewis
U.S. Department of Commerce
Office of the Chief Counsel for Trade Enforcement & Compliance
1401 Constitution Ave., NW
Washington, DC 20230

    /s/ Bernd G. Janzen
        Bernd G. Janzen